The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Wanda Blanche Taylor, the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; rehear the parties or their representatives; or amend the Opinion and Award. Plaintiff's motion for change of treating physician and additional medical treatment is hereby DENIED. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Wanda Blanche Taylor.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties are subject to the North Carolina Workers' Compensation Act.
3. At all relevant times, plaintiff was an employee of Vulcan Materials Company, a qualified self-insured employer under the provisions of the North Carolina Workers' Compensation Act.
4. Plaintiff was injured during the course and scope of his employment with defendant on May 4, 1996.
5. At the time of his injury by accident, plaintiff's average weekly wage was $710.26.
6. The following exhibits were admitted by stipulation of the parties:
 • Stipulated Exhibit 1 — Bound set of medical records (the medical records were supplemented by adding the January 26, 1999 MRI report prepared for Dr. Gudeman and admitted as Exhibit 1 to the deposition of Dr. Raymond C. Sweet).
 • Stipulated Exhibit 2 — Medical records from Dr. Henry at Marshville Family Medicine.
 • Stipulated Exhibit 3 — Job Analysis for Parts Runner/Light General Maintenance Job signed by Dr. Walsh on February 6, 1997.
 • Stipulated Exhibit 4 — Plaintiff's 1996 attendance records (Submitted following the hearing).
 • Stipulated Exhibit 5 — Plaintiff's 1997 attendance records (submitted following the hearing).
 ***********
A Form 21, Agreement for Compensation for Disability, was approved by the Industrial Commission on October 18, 1996 undertaking to pay plaintiff compensation at the rate of $473.53 for necessary weeks. A Form 26, Supplemental Agreement as to Payment of Compensation, was approved by the Industrial Commission on October 18, 1996 undertaking to pay plaintiff temporary total disability at the rate of $473.53 for necessary weeks. A Form 26, Supplemental Agreement as to Payment of Compensation, was approved by the Industrial Commission on March 24, 1998 undertaking to pay plaintiff temporary total disability at a rate of $473.53 for necessary weeks. These agreements constitute orders of the Commission.
 ***********
Based upon all the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was 51 years old and had been employed by defendant-employer as a truck driver at its Rockingham quarry.
2. On May 4, 1996, plaintiff was sitting in a Vulcan truck when the bed in the rear of the truck was struck by a shovel that was loading material, causing his neck to jerk.
3. Plaintiff complained of neck pain and was sent to the local emergency room. The cervical spine x-rays taken at the emergency room revealed no evidence of a chip fracture, but instead found multiple spurs at different levels of plaintiff's cervical spine and pre-existing degenerative disc disease.
4. Plaintiff saw Dr. Daniel C. Hall, a family practitioner in Rockingham, on May 6, 1996, who diagnosed him with an acute cervical sprain and long-standing osteoarthritis of the cervical spine. Dr. Hall wrote plaintiff out of work for four days and set up a course of physical therapy. Plaintiff saw Dr. Hall on May 10, 1996 and his condition had significantly improved so that Dr. Hall released him to return to light duty work. Plaintiff returned to see Dr. Hall on May 13, 1996 and complained of increased pain. Dr. Hall felt that plaintiff was not improving based upon his subjective complaints but had no objective findings, and he referred plaintiff for a neurosurgical consultation.
5. Dr. Hall last saw plaintiff on May 20, 1996 and noted that his neurologic exam was normal and that he was voluntarily restricting the movement of his neck. During this visit, plaintiff complained of pain in his neck, his ear, his scalp and even his hair. Dr. Hall was of the opinion that plaintiff was malingering and not truthfully reporting his symptoms.
6. Plaintiff saw Dr. Mark Brenner, an orthopaedic surgeon with Pinehurst Surgical Clinic, on referral from Dr. Hall from May 15, 1996 through October 22, 1996. During his first visit with plaintiff on May 15, 1996, Dr. Brenner diagnosed plaintiff with a cervical sprain superimposed upon some preexisting degenerative arthritis and released him to light duty work. Dr. Brenner ordered a cervical MRI scan, which revealed degenerative disc disease and degenerative changes at C5-6, C6-7 and C4-5. He prescribed a course of conservative treatment, including medication and physical therapy. Plaintiff increasingly complained to Dr. Brenner of a variety of complaints. Dr. Brenner provided plaintiff with a complete diagnostic workup, including an MRI of the brain and a bone scan; both were normal. Dr. Brenner determined that plaintiff was having a variety of unusual complaints for which he could not find objective medical causes. Dr. Brenner was of the opinion that plaintiff reached maximum medical improvement on October 22, 1996 and retained a 2% permanent partial impairment rating to his cervical spine.
7. Dr. Brenner was of the opinion that plaintiff's work injury should not have aggravated his physical condition for more than three months, and that if plaintiff needed a neck fusion, it was not related to his work injury, but to the natural progression of his degenerative disease.
8. Plaintiff was then seen by Dr. Joseph Walsh, a neurologist with Mecklenburg Neurological Associates, from December 20, 1996 through August 22, 1997. On December 20, 1996, plaintiff presented to Dr. Walsh complaining of headaches, neck pain, decreased range of neck motion and intermittent hand tremors. Dr. Walsh performed a neurologic exam and his initial assessment of plaintiff was a possible chronic cervical sprain, cervicogenic headache and a psychogenic hand tremor that had no organic basis. Dr. Walsh continued to follow plaintiff and prescribed physical therapy, pain medication and trigger point injections. On plaintiff's February 6, 1997 visit, Dr. Walsh was of the opinion that plaintiff no longer had a chronic cervical sprain, and released him to return to work on modified duty driving a pick up truck for four hours a day for two weeks, then six hours a day for two weeks, then eight hours a day. Plaintiff worked approximately four hours each day February 10 through February 12, 1997, then complained the modified duty was too difficult and again went out of work. Plaintiff returned to see Dr. Walsh on March 14, 1997 and complained of increased neck pain. Dr. Walsh noted that plaintiff continued to have an abnormal forward head posture that he believed was contributing to his neck pain. Dr. Walsh was of the opinion that plaintiff's abnormal head posture was voluntary on his part (he had been instructed not to continue it as it was worsening or causing his pain) and not related to his May 4, 1996 work injury. Dr. Walsh became increasingly concerned that plaintiff was not motivated to return to work. Plaintiff next saw Dr. Walsh on May 14, 1997. Dr. Walsh was of the opinion that plaintiff had an extreme degree of symptom magnification. Dr. Walsh strongly encouraged plaintiff to try to return to work and gave him a six-month lifting restriction of 20 pounds and then removed all restrictions after the six-month period. Although released by Dr. Walsh to work within his previous restrictions, plaintiff did not return to work until May 19, 1997. Plaintiff nonetheless returned to see Dr. Walsh on June 16, 1997 and complained of chronic severe and unremitting neck pain that was so bad that he claimed he could not stand the weight of an 8 oz. plastic hard hat.
9. Plaintiff returned to work for Vulcan on May 19, 1997 and worked through August 1, 1997. Plaintiff terminated his employment on August 1, 1997 because he claimed his pain was too great. Plaintiff has not returned to work for Vulcan.
10. Plaintiff presented to Dr. Walsh on August 22, 1997 and complained that even small amounts of movement, including movements which did not require movement of the neck, gave him incapacitating pain. Dr. Walsh determined that plaintiff was malingering, that he had reached maximum medical improvement, and that he retained a 0% permanent impairment.
11. Dr. Walsh was of the opinion that there was no medical reason that plaintiff could not have returned to work for Vulcan as of August 22, 1997 and that the only physical limitation plaintiff had was his abnormal head posture that was unrelated to plaintiff's May 4, 1996 work injury.
12. Plaintiff saw Dr. Jay Parikh for an orthopaedic consultation on April 22, 1998. Dr. Parikh noted that plaintiff would not let him move his neck and that plaintiff had subjective complaints, but no neurologic findings. Dr. Parikh offered physical therapy, but plaintiff refused.
13. After receiving discovery responses from plaintiff in June 1998 that asserted that he was not working, Vulcan hired a private investigator, Ed Musselwhite, to conduct surveillance on plaintiff. Mr. Musselwhite conducted surveillance on plaintiff on July 20, 1998, July 21, 1998 and September 3, 1998. On these occasions, plaintiff was observed driving a commercial logging truck with the name "Burroughs Trucking" on the side of the door. Plaintiff was observed driving long distances in his logging truck without indication of any limitation.
14. Plaintiff saw Dr. Steven Gudeman, a neurosurgeon in Gastonia, on January 14, 1999 for an independent medical evaluation. Dr. Gudeman ordered an MRI, which revealed multilevel degenerative changes in plaintiff's cervical spine, and an EMG of plaintiff's upper extremities, which showed no evidence of radiculopathy. After reviewing the diagnostic studies, Dr. Gudeman recommended on February 1, 1999 that plaintiff return for discussion as to whether surgical intervention would be beneficial because he was of the opinion that plaintiff would benefit from anterior cervical diskectomy and fusion at C5-6 and potentially at C6-7. After reviewing all of plaintiff's prior medical records, however, Dr. Gudeman opined that he would need to re-examine plaintiff and reevaluate his need for surgery. Dr. Gudeman agreed with Dr. Hall, Dr. Brenner and Dr. Walsh's opinions that plaintiff was malingering at the time they saw them. Dr. Gudeman also agreed with Dr. Walsh's determination that plaintiff had reached MMI on August 22, 1997 and agreed with his 0% PPD rating.
15. Plaintiff was seen by neurosurgeon Dr. Raymond C. Sweet for an independent medical examination on April 21, 1999. Dr. Sweet reviewed plaintiff's prior medical records and gave him a general physical and neurological examination. Dr. Sweet noted that plaintiff had a tightness of the neck that appeared to be voluntary on the part of the patient. Dr. Sweet also reviewed plaintiff's medical records, including Dr. Gudeman's notes and the January 26, 1999 MRI report ordered by Dr. Gudeman. Dr. Sweet was of the opinion that plaintiff did not need a surgical procedure on his cervical spine, and that even if surgery were necessary for plaintiff, it was not related to his May 4, 1996 work injury.
16. On May 4, 1996, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with defendant-employer. Defendant accepted the compensability of this injury by Form 21.
17. As a direct and proximate result of his May 4, 1996 compensable injury by accident, plaintiff retains a 2% permanent partial impairment of his cervical spine.
18. Vulcan accepted plaintiff's claim pursuant to a Form 21 approved by the Industrial Commission on or about October 18, 1996. After plaintiff was released to return to modified duty by Dr. Walsh, and returned to work on February 10, 1997, Vulcan submitted a Form 28T to the Industrial Commission. Plaintiff never obtained an executed Form 28U. After plaintiff quit on August 1, 1997, Vulcan continued to pay plaintiff temporary total disability benefits through February 19, 1998. Plaintiff's last compensation check was forwarded on February 24, 1998.
19. Plaintiff reached maximum medical improvement on August 22, 1997 and had no permanent impairment or work restrictions after that date.
20. Plaintiff unjustifiably refused suitable employment when he voluntarily terminated his employment on August 1, 1997.
21. Plaintiff consistently magnified his symptoms to his healthcare providers.
22. To the extent plaintiff requires surgery, which has been considered by Dr. Gudeman but not yet recommended, such surgery is not related to plaintiff's injury by accident, the resulting cervical sprain and the sequella thereof, but is solely related to his pre-existing condition.
23. Plaintiff was self-employed as a logging truck operator beginning at least July 1998 and was able to be gainfully employed following August 22, 1997.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On May 4, 1996, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer resulting in a cervical sprain.
2. Defendant accepted plaintiff's injury as compensable by a Form 21, Agreement for Compensation, undertaking to pay compensation to plaintiff for necessary weeks.
3. Although plaintiff returned to work in a trial return to work, at the time that he terminated his employment, he still had a lifting restriction. However, though plaintiff is entitled to a presumption of disability based upon the Form 21, defendant rebutted that presumption by proving by the greater weight that plaintiff's complaints of pain and limitations are not credible, are not medically related to his compensable injury, and that plaintiff was able to work as of August 22, 1997.
4. Plaintiff unjustifiably refused suitable employment when he quit his job with defendant-employer on August 1, 1997. N.C. Gen. Stat. § 97-32; Franklin v. Broyhill Furniture Industries, 123 N.C. App. 200
(1996).
5. On August 22, 1997, plaintiff reached maximum medical improvement of his cervical sprain and retained a 2% permanent partial impairment of his back as a direct and proximate consequence of that compensable injury.
6. Plaintiff is not entitled to compensation after August 22, 1997.
7. Plaintiff is entitled to compensation at the rate of $473.53 for a period of six weeks for his permanent partial impairment of the back.
8. Plaintiff is not entitled to any further medical treatment at the expense of defendant.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay plaintiff permanent partial disability compensation at the rate of $473.53 for a period of six weeks for his 2% permanent partial impairment of the back. This amount is subject to a reasonable attorney's fee approved in Paragraph 2.
2. A reasonable attorney's fee of 25% of the Award contained in Paragraph 1 is approved for plaintiff's counsel and shall be deducted from that sum and paid directly to plaintiff's counsel.
3. Defendant shall pay the costs.
This 7th day of November 2001.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER